1 PAUL B. SNYDER
United States Bankruptcy Judge
2 1717 Pacific Ave, Suite 2209
Tacoma, WA 98402
3

4

5
                                                    ✓ FILED
                                                ____LODGED
                                                ____RECEIVED

                                              **August 24, 2009**
6
                                           MARK L. HATCHER
                                      CLERK U.S. BANKRUPTCY COURT
7                                    WESTERN DISTRICT OF WASHINGTON
                                               AT TACOMA
                                      _____DEPUTY
8

9                    **UNITED STATES BANKRUPTCY COURT**
              **WESTERN DISTRICT OF WASHINGTON AT TACOMA**

10   In re:                                    Case No. 08-45227

11   PIERCE COUNTY HOUSING AUTHORITY       **AMENDED MEMORANDUM DECISION**
     603 S. POLK STREET                         **NOT FOR PUBLICATION**
12   TACOMA, WA 98445-0410
     TAX ID 91-1105806,
13
                        Debtor.
14
            THIS MATTER came before the Court as an evidentiary hearing held on July 15 and 16, 2009,
15
     to determine the eligibility of Pierce County Housing Authority (Debtor) to file a petition under Chapter
16
     9 of the Bankruptcy Code and for confirmation of the Debtor's proposed plan for adjustment of debts
17
     (Plan).[1]  Objections to both the Debtor's eligibility and Plan were filed by the Eagles Watch Creditors.
18
     Objections to the Debtor's Plan were also filed by U.S. Bank National Association, in its capacity as
19
     indenture trustee (US Bank), and the Unsecured Creditors Committee (UCC).  The UCC and the
20
     Debtor were able to reach an agreement regarding the UCC's objections, and the Debtor's First
21
     Amended Plan for Adjustment of Debts (Amended Plan) was filed on July 16, 2009.  At the evidentiary
22
     hearing, US Bank also indicated that its objections had been resolved.  At the conclusion of the
23
     hearing, the Court took the matter under advisement and requested further briefing from the Eagles
24   _____

25   [1]Unless otherwise indicated, all "Code," Chapter and Section references are to the Federal Bankruptcy Code,
     11 U.S.C. §§ 101-1532, as amended by BAPCPA, Pub. L. 109-8, 119 Stat. 23, as this case was filed after
     October 17, 2005, the effective date of most BAPCPA provisions.

     AMENDED MEMORANDUM DECISION - 1

Watch Creditors and the Debtor.  A supplemental brief was filed by the Eagles Watch Creditors on July 20, 2009.  The Debtor's supplemental brief was filed on July 24, 2009.  This Amended Memorandum Decision is filed in accordance with Fed R. Civ. P. 60(a) and shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr. P. 7052.

**I**

**FINDINGS OF FACT**

The Debtor is a non-profit public entity created in 1978, pursuant to Washington State statute, for the purpose of providing affordable housing for low-income families.  The Debtor owns fourteen affordable housing apartment complexes and annually serves thousands of individuals in Pierce County, Washington.  The Debtor is governed by a Board of Commissioners, consisting of six individuals who are appointed by the Pierce County Executive to serve for rotating, five-year terms. The Debtor has approximately 62 employees.

The Debtor normally receives funds for its operations from three sources: (1) operating subsidies and grants provided by the U.S. Department of Housing and Urban Development (HUD), (2) grants from local governments and non-profit agencies, and (3) rent from its properties.  The Debtor's use of each source is restricted by statute, regulation, grant conditions or bond covenants.

The Debtor currently has a small pool of unrestricted funds.  In 2003 and 2005, the Debtor sold several of its properties that were not subject to its 1998 Pooled Housing Refunding Revenue Bonds (1998 Bonds), generating capital available for general use.  The 2003 and 2005 sales generated net proceeds of approximately $2.5 million.  The majority of these proceeds have been consumed by litigation costs.

The Debtor cannot generate additional unrestricted funds from the sale of any of its remaining properties because 13 of its 14 affordable housing properties are subject to the 1998 Bonds.  The Debtor irrevocably pledged all of the revenues from these properties, less operating and maintenance expenses, to the payment of the 1998 Bonds.  The current principal amount owed on the 1998 Bonds is approximately $27,000,000.

AMENDED MEMORANDUM DECISION - 2

The only property not subject to the 1998 Bonds is the Orting Senior Center, a 20-unit apartment complex. This property is financed and subsidized by the Rural Development Project of the U.S. Department of Agriculture (USDA). The current principal amount owed for the loan on that property is approximately $620,000. The Debtor's use of revenues from the Orting Senior Center is restricted by USDA regulations. The Debtor also owes approximately $995,000 on a loan from Les and Diana Froembling, which is secured by real property located in Tacoma, Washington.

One of the Debtor's properties is the Eagles Watch Apartments (Eagles Watch), located in Puyallup, Washington. In June, 2006, a complaint was filed by a tenant of Eagles Watch, Mary Draper (Draper), against the Debtor in Pierce County Superior Court (Draper Litigation). This lawsuit was filed on Draper's behalf by the law firm of Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim LLP (Gordon Thomas firm). Draper alleged in the complaint that she had sustained personal and property injury due to mold. Twenty-eight current and former tenants were joined in the action, including the Feltons family. The Feltons settled with the Debtor shortly after joining the lawsuit. The Debtor has consistently denied liability and damages for any mold-related claims.

In late 2007, the Debtor and the remaining plaintiffs settled for a cash payment of $750,000. The settlement was formalized in November, 2007, and the Debtor paid the settlement amount shortly thereafter. The Debtor expended approximately $1.2 million in legal fees in defending the Draper Litigation.

In January, 2008, another tenant, also represented by the Gordon Thomas firm, filed suit in Pierce County against the Debtor (L.M. v. PCHA, No. 08-2-04451-9). The suit again alleged injuries due to mold infestation at Eagles Watch.

In February, 2008, the Feltons moved for a new trial date in the Draper Litigation because the guardian ad litem for their minor child had disapproved the settlement. In March and April, 2008, the Gordon Thomas firm filed three Public Records Act complaints, alleging that the Debtor had delayed in producing its then-counsel's legal bills and invoices for fees incurred in the Draper Litigation.

AMENDED MEMORANDUM DECISION - 3

In May, 2008, the Debtor began receiving claims entitled "Claims Regarding the Tortious Conduct of Pierce County Housing Authority" from current and former tenants (as well as their guests) alleging mold infestation at Eagles Watch. Despite the settlement, all but two of the former plaintiffs in the Draper Litigation also gave notice of their intent to continue to litigate their previously asserted claims against the Debtor. The plaintiffs in the Draper Litigation allege that the settlement was fraudulently obtained based on alleged misrepresentations by the Debtor regarding the amount of attorneys fees incurred in the Draper Litigation.

On September 12, 2008, the Gordon Thomas firm filed Anderson v. PCHA, No. 08-2-12411-3, alleging mold-related claims by 80 plaintiffs. On September 20, 2008, the Debtor received four additional administrative claims. Since January, 2008, the Debtor has received mold-related claims by clients of the Gordon Thomas firm alleging a total of $21 million in damages.

A mediation was scheduled for October 6 and 7, 2008, between the Debtor and the Gordon Thomas firm in an effort to obtain a global settlement of all the mold-related claims, including the Draper Litigation. The parties were unable to reach a settlement and the mediation was concluded prior to the end of the first day.

The Debtor filed a Chapter 9 bankruptcy petition (Petition) on October 13, 2008. A Statement of Qualifications under 11 U.S.C. § 109(c) was filed with the Petition. On October 28, 2008, an order was entered setting December 18, 2008, as a deadline for objecting to the Petition and January 16, 2009, for the Debtor to file a plan of adjustment.

On December 18, 2008, Darrell L. Cochran (Cochran), filed an Objection to Debtor's Bankruptcy Petition (Objection to Petition). Cochran was originally with the Gordon Thomas firm and is currently with the law firm of Pfau Cochran Vertetis Kosnoff, PLLC. The Objection to Petition states that Cochran is filing the objection "individually and as attorney for other Creditors who have state court claims pending against Debtor." Objection to Debtor's Bankruptcy Petition at 1 (No. 38). Cochran alleges in the Objection to Petition that the Debtor does not meet the eligibility requirements for filing a Chapter 9 petition.

AMENDED MEMORANDUM DECISION - 4

On January 6, 2009, the Debtor filed a motion to continue the date for filing its Plan from January 16, 2009. After a hearing, an order was entered on January 20, 2009, continuing the deadline for filing a Plan to a date at least 30 days after entry of a final order fully disposing of all issues raised in the Objection to Petition.

On January 21, 2009, the Debtor filed a motion for entry of an order denying the Objection to Petition. The Debtor's motion was scheduled for hearing on March 5, 2009. At the parties' request, the March 5, 2009 hearing was subsequently continued to April 15, 2009, to allow the parties to attempt mediation. After multiple mediation sessions taking place over several months, the mediation proved to be unsuccessful.

On March 25, 2009, the Court scheduled a two-day hearing to determine the Debtor's eligibility and to approve the Debtor's Disclosure Statement and Plan for July 15 and 16, 2009. The Debtor filed its Chapter 9 Plan and Disclosure Statement on May 27, 2009. Objections to both the Debtor's eligibility and Plan were filed by the Eagles Watch Creditors. Objections to the Debtor's Plan were also filed by US Bank and the UCC. Prior to the hearing, the UCC and the Debtor agreed to the terms of an amended plan. A First Amended Plan for Adjustment of Debts of Pierce County Housing Authority (Amended Plan) was filed on July 16, 2009.

The Amended Plan proposes that the Debtor retain each of its properties and continue to operate in the ordinary course of business in providing low-cost housing to Pierce County residents. Creditors are divided into five classes. Class 1 consists of the secured claim of US Bank as indenture trustee of the bondholders under the 1998 Bond refinancing. Class 1 shall be paid in full pursuant to the terms of the Bond Indenture agreements. Class 2 consists of the secured claim of the USDA and will be paid in full pursuant to the terms and conditions of the applicable loan documents. Class 3 consists of the secured claim of Les and Diana Froembling and will be paid in full pursuant to the terms and conditions of the applicable loan documents. Class 4 consists of the unsecured claim of Good Samaritan Healthcare, Inc. (Good Samaritan). Good Samaritan asserts an unsecured claim in the approximate amount of $130,000. Class 4 shall be paid in full in monthly payments following

AMENDED MEMORANDUM DECISION - 5

confirmation in the form of a credit against rent and other amounts that would otherwise be due and owing in connection with Good Samaritan's lease of apartment units from the Debtor, up to a maximum of $2,000 in any one month.

Class 5 consists of all remaining unsecured claims. Class 5 includes, but is not limited to, the unsecured claims of mold claimants. Holders of Class 5 claims are offered alternative payment terms. Under Alternative A, each claimant will receive a one-time cash payment equal to the lesser of $1,000 or the amount of their allowed claim in full and in complete satisfaction of their claim. Each holder of an allowed Class 5 claim must make an election for such treatment in conjunction with completing the ballot on approval of the Plan. Claimants that select Alternative A shall be paid from a distribution fund (i) after payment of the administrative expenses in advance of any distributions to claimants electing treatment under Alternative B, (ii) on a pro rata basis if funds are insufficient to pay all such claims in full, and (iii) within five business days of the later of the date that (a) the funds in the distribution account are sufficient to pay in full all claimants electing treatment under Alternative A, or (b) all recoverable assets have been liquidated.[2] The Amended Plan defines the Distribution Account as a separate bank account into which all recoveries for subsequent distribution to Class 5 shall be placed. Article 2.A.20. Recoveries are defined as the net proceeds from (i) recoveries on Avoidance Claims, (ii) recoveries on Insurance Claims, and (iii) the sale of the Adjacent Lot, as such terms are further defined therein. Article 2.A.42. A holder of a Class 5 claim can also elect treatment under Alternative B. Those who reject the Amended Plan or do not return a ballot will also be treated under Alternative B. Under Alternative B, each claimant will retain the right to receive a distribution up to the full amount of their claim, but only after all payments have been made under Alternative A in full. In the event there are insufficient funds to pay Alternative B claimants in full, they shall receive their pro rata share of such funds in full and satisfaction of their claim.

---

[2] Article IV.B.5.b.(1) bullet point two contains several typos and incorrect labeling on the subheads that will need to be amended. The Debtor has since indicated that the phrase "the later of" should be amended to "the earlier of."

AMENDED MEMORANDUM DECISION - 6

The Amended Plan proposes that the Debtor will sell certain real property adjacent to its administrative offices and deposit all net proceeds in the Distribution Account. An examiner will be appointed to investigate and report to this Court whether Pierce County holds any insurance coverage to or for the Debtor regarding mold-related claims. If the examiner determines that the Debtor holds claims for which any insurance held by Pierce County would provide coverage, such claims shall be assigned to a "Post-Confirmation Committee," which is defined as the UCC following confirmation. Article II.A.40. All other insurance claims shall be assigned to the Post-Confirmation Committee pursuant to Article VII.F. Any net proceeds recovered from the insurance claims shall also be deposited in the Distribution Account.

**II**

**CONCLUSIONS OF LAW**

**A. Eligibility**

According to § 109(c), [a]n entity may be a debtor under chapter 9 of this title if and only if such entity –

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

AMENDED MEMORANDUM DECISION - 7

To be eligible for Chapter 9 relief, the petition must meet each of the requirements of § 109(c)(1) – (4) and one of the requirements under § 109(c)(5). Section 921(c) contains the added requirement that the court may dismiss the petition if the debtor did not file the petition in good faith.

There is no objection or dispute that the Debtor meets the requirements of § 109(c)(1) and (2). Although the Eagles Watch Creditors indicated in their Pretrial Statement that the Debtor does not meet § 109(c)(4), no further argument or briefing to support this claim was provided. Section 109(c)(4) requires a Chapter 9 petitioner to establish that it has a desire to effect a plan to adjust its debts. The Debtor in this case satisfies this requirement by a preponderance of the evidence. Not only did the Debtor file a Statement of Qualifications stating its intent to effect a plan to adjust its debts, the Debtor has spent extensive time drafting and negotiating a Plan and Amended Plan. See In re City of Vallejo, 408 B.R. 280, 295 (9th Cir. BAP 2009) (municipality may meet subjective eligibility requirement of having intent to effect a plan with direct or circumstantial evidence, and may prove its desire by attempting to resolve claims, by submitting a draft plan, or by other evidence customarily submitted to show intent).

At issue in this case then is whether the Debtor is ineligible for Chapter 9 relief because it is not insolvent as required by § 109(c)(3), did not negotiate in good faith with creditors as required by § 109(c)(5)(B), and did not file the petition in good faith as required by § 921(c).

The burden is on the debtor to establish eligibility under § 109(c). In re Valley Health Sys., 383 B.R. 156, 161 (Bankr. C.D. Cal. 2008). The eligibility requirements of § 109(c) are to be broadly construed "'to provide access to relief in furtherance of the Code's underlying policies.'" Valley Health Sys., 383 B.R. at 163 (quoting Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares (In re Hamilton Creek Metro. Dist.), 143 F.3d 1381, 1384 (10th Cir. 1998)).

1. Section 109(c)(3)

A municipality is insolvent if it is: (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due.

Section 101(32)(C). The Debtor admits that it was current on its obligations as of the petition date, and instead alleges insolvency under the second prong of the insolvency test. This is a prospective test, with the reference point being the date the petition was filed. In other words, "it must be determined as of [the petition date] whether [the Debtor] *will be* unable to pay its debts as they become due." In re City of Bridgeport, 129 B.R. 332, 337 (Bankr. D. Conn. 1991). This is a cash flow, not a budget deficit, analysis. City of Bridgeport, 129 B.R. at 337.

The Debtor's expert, Kent Mordy of Mordy Consulting PC (Mordy), testified that it is his opinion that the Debtor was insolvent as of the petition date, as defined by § 101(32)(C)(ii), because the Debtor would have been unable to pay its debts as they became due had the bankruptcy petition not been filed. In making this determination, Mordy properly evaluated the current fiscal year and the next fiscal year. See City of Bridgeport, 129 B.R. at 338 (to be found insolvent, a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year).

If a Chapter 9 had not been filed, Mordy testified that the Debtor's estimated cash shortfall for the 2009 fiscal year would have been $941,000. To arrive at this number, Mordy calculated an Unfunded Cash Loss based on the Debtor's 2009 cash projections of $26,000 and then added back in the Debtor's budgeted legal fees related to the bankruptcy filing of $322,000 and $163,000 in excess reserves in accounts of the bond trustee as of December 31, 2008. This amount includes undisputed unpaid obligations of $100,000, and anticipated legal fees to defend the mold litigation if the Chapter 9 filing had not occurred of $1,300,000. Cova Hunter, Debtor's Director of Finance, testified that this figure is probably understated, as it does not include any amounts for the payment of judgments or in settlement. She testified that the amount is also conservative in light of legal fees incurred by the Debtor in the prepetition Draper Litigation. In that case, the Debtor incurred approximately $1.2 million in legal fees in defending a claim involving 29 current and former Eagles Watch tenants. At the time the Petition was filed, the Debtor faced not one, but seven pending cases involving substantially more defendants. Six of these actions had trial dates in 2009. Although the anticipated legal fees are

AMENDED MEMORANDUM DECISION - 9

speculative, the Eagles Watch Creditors did not present any evidence to the contrary. The Court finds the Debtor's witnesses' testimony to be credible.

The Eagles Watch Creditors argue that the Debtor was not insolvent when the Petition was filed because, based on Mordy's own figures, it had assets consisting of buildings and equipment, of approximately $44,000,000 as of the petition date.[3] Hunter testified, however, that such assets could not be sold to fund litigation because 13 of the Debtor's 14 properties (the Affordable Housing properties) are subject to liens securing either the 2008 Bonds or the HUD Rural Development Program loan, and the residences under the LIPH Program are subject to HUD restrictions. The Eagles Watch Creditors failed to present any evidence to refute or contradict this testimony.

Although the Debtor has substantial assets and cash reserves, it has very limited funds and other assets that are not subject to a pre-existing limitation or restriction on their use. Nor does the Debtor have the ability to increase its discretionary funds. As stated above, the undisputed evidence is that properties cannot be sold as they were in 2003 and 2005 to fund litigation and settlement costs.[4] Nor could this Debtor increase rents to create unrestricted funds. State law apparently prohibits the Debtor from operating at a profit, and rents may be no higher than is necessary to fund current bond payments and reserves, and to pay for administrative expenses and the cost of operating and maintaining its properties. See RCW 35.82.080.

The Eagles Watch Creditors also argue that the Debtor cannot prove that it is insolvent because it is has failed to tender their claims to Pierce County or potential insurers. The Eagles Watch Creditors have failed to provide, and the Court is unaware of, any case law holding that potential insurance coverage should be considered in the insolvency analysis. Particularly when a preponderance of the testimony of the witnesses acknowledges that coverage will be hotly contested.

---

[3] Mordy clarified in testimony that this number is not reflective of fair market value for the assets, but depicts the Debtor's original costs for the purchase of such assets.
[4] Mordy further clarified that the term "Unrestricted Net Assets" as used on Exhibit D to his declaration (submitted as Debtor's Exhibit 16), is simply an accounting term and does not mean that such funds can be used for any purpose. Mordy testified that such funds could not be used to fund additional litigation or settlement costs.

AMENDED MEMORANDUM DECISION - 10

None of the cases cited by the Eagles Watch Creditors in support of their argument involve insurance coverage or are analogous to the situation before this Court. For instance, in In re Ellicott Sch. Bldg. Auth., 150 B.R. 261, 265 (Bankr. D. Colo. 1992), the bankruptcy court determined that insolvency had not been conclusively demonstrated where the debtor had access to a reserve fund and a defaulted rent payment from which it could make its current debt payments. Likewise, in City of Bridgeport, the court found that the city failed to establish that it was insolvent where it had approximately $28 million in surplus funds from bond sale proceeds. City of Bridgeport, 129 B.R. at 337.[5] In each of these cases, the debtor had available a tangible reserve fund from which debts could be paid.

Unlike the debtors in the cases cited above, the Debtor before this Court does not have a tangible reserve fund from which debts can be paid. Not only is liability for any mold-related damages contested, even if liability could be established, there remains the issue of whether Pierce County or an insurer would be liable for such obligations. The Debtor has consistently maintained that Pierce County has no liability for its obligations under State law. See RCW 35.82.130. As in Sullivan, this Court agrees that the failure of the Debtor to pursue potential insurance coverage by Pierce County, "if relevant at all, has to do with 'good faith' issues . . . and not with their status of insolvency." Sullivan, 165 B.R. at 76.

The Court concludes that the Debtor has established that it was insolvent as of the petition date as required by § 109(c)(3).

2. Section 109(c)(5)(B)

In order to be eligible to be a debtor under Chapter 9, the Debtor must establish that it can satisfy one of the requirements under § 109(c)(5). The Debtor has alleged that it meets the requirements of either § 109(c)(5)(B) or (C).

---

[5] In its brief, the Eagles Watch Creditors also cite to the case of In re Sullivan County Reg'l Refuse Disposal Dist., 165 B.R. 60 (Bankr. D. N.H. 1994). This case, however, does not support their position as the court in Sullivan determined that the debtor had established insolvency and that the debtor's failure to impose a special assessment on member towns to raise funds to meet its obligations was irrelevant to the issue of insolvency. Sullivan, 165 B.R. at 76.

AMENDED MEMORANDUM DECISION - 11

Section 109(c)(5)(B) requires that the Debtor establish that it "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter."

On June 26, 2009, the Bankruptcy Appellate Panel of the Ninth Circuit (BAP) filed an opinion in the case of In re City of Vallejo, 408 B.R. 280 (9th Cir. BAP 2009). In Vallejo, the City of Vallejo (Vallejo) filed a Chapter 9 petition and several of Vallejo's unions challenged its eligibility for relief under that chapter. The bankruptcy court determined that Vallejo was eligible under Chapter 9 and the unions appealed. On appeal, the unions argued that the bankruptcy court erred in finding that Vallejo's prepetition negotiations met the statutory requirements of 11 U.S.C. § 109(c)(5)(B) because they did not include negotiations over the possible terms of a plan of adjustment. Vallejo, 408 B.R. at 296.

Recognizing that the plain language of § 109(c)(5)(B) was unclear, the BAP examined the remaining language in the statute to hold that § 109(c)(5)(B) requires "negotiations with creditors revolving around a proposed plan." Vallejo, 408 B.R. at 297. "[W]hile a complete plan is not required, some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary." Vallejo, 408 B.R. at 297. As the "evidence was undisputed that Vallejo never negotiated with Unions or any of its creditors over the possible terms of a plan of adjustment," the BAP concluded that the bankruptcy court erred in finding that Vallejo satisfied § 109(c)(5)(B). Vallejo, 408 B.R. at 297.

As in Vallejo, it is undisputed that the Debtor and the Eagles Watch Creditors participated in extensive prepetition negotiations. However, also as in Vallejo, there is no evidence that the Debtor ever negotiated prepetition with any of its creditors over the possible terms of a plan of adjustment. Based on the testimony submitted, the only mention of bankruptcy by the Debtor prepetition was statements at the October 6, 2008 mediation suggesting that bankruptcy was an option being considered. Thus, the Debtor is unable to satisfy the requirements of § 109(c)(5)(B).

AMENDED MEMORANDUM DECISION - 12

3. Section 109(c)(5)(C)

The Debtor alleges that it also meets the requirements of § 109(c)(5)(C). Section 109(c)(5)(C) provides that "[a]n entity may be a debtor under chapter 9 of this title if and only if such entity . . . is unable to negotiate with creditors because such negotiation is impracticable." Although the burden is on the Debtor to establish that the eligibility requirements have been met, the Court notes that despite the fact that the Debtor has consistently indicated that it is alleging eligibility under both § 109(c)(5)(B) and (C), the Eagles Watch Creditors have never offered any evidence or argument to challenge the Debtor's eligibility under § 109(c)(5)(C).

"Whether negotiations with creditors is impracticable depends upon the circumstances of the case." Vallejo, 408 B.R. at 298. "'Impracticable' means 'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.' In the legal context, 'impracticability' is defined as 'a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty.'" Vallejo, 408 B.R. at 298 (quoting Valley Health Sys., 383 B.R. at 163). "Petitioners may demonstrate impracticability by the sheer number of their creditors or by their need to file a petition quickly to preserve their assets." Vallejo, 408 B.R. at 298.

The Debtor alleges that negotiations were impracticable in this case based on the sheer number of creditors. Although the Debtor did engage in prepetition negotiations, such negotiations only involved the litigants represented by Cochran. Admittedly, Cochran only represents a minority (less than 150) of the Debtor's potential creditors. The Debtor has indicated that it has thousands of current and former tenants, as well as their guests, that could conceivably assert mold-related damage claims. Over 7,000 creditors and parties in interest were set forth on the mailing matrix in this case. The vast majority of these parties are current and former tenants of the Debtor's 14 apartment complexes. These numbers do not include potential unknown plaintiffs, which may include the guests of current and former tenants. See, e.g. Valley Health Sys. 383 B.R. at 165 (finding that § 109(c)(5)(C)

AMENDED MEMORANDUM DECISION - 13

requirement was met where the debtor's petition disclosed not more than 5,000 creditors holding claims in excess of $100 million). Given the Debtor's unsuccessful attempts to settle with the existing plaintiffs pre and postpetition, the Court agrees that it would have been impracticable, if not impossible, for the Debtor to negotiate and settle with all potential creditors prior to filing its Chapter 9 petition. Accordingly, the Debtor has met its burden of establishing that it is eligible for Chapter 9 relief.

    4. Section 921(c)

Although this is not an eligibility requirement per se, § 921(c) provides that a court may dismiss a Chapter 9 petition if the debtor did not file the petition in good faith. Unlike the eligibility requirements of § 109(c), the court's power to dismiss a petition under § 921(c) is permissive, not mandatory. 6 Collier on Bankruptcy ¶ 921.04[4], at 921-7 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.). Facts that may be relevant to this analysis include "(i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practicable; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems." Collier ¶ 921.04[2], at 921-5 to -6 (citations omitted).

The legislative history indicates that the strict hurdles to filing Chapter 9 were implemented to ensure that it was considered by a municipality only as a last resort. See Sullivan, 165 B.R. at 82. In the present case, the evidence suggests that the Debtor made the decision to file Chapter 9 only after several years of negotiations and attempts at mediation failed. The first mold-related case (Draper Litigation) was filed in June, 2006. After an extensive mediation held in August, 2007, the parties agreed to a settlement. This settlement, however, did not end the litigation. Several additional lawsuits, also claiming mold-related damages, were subsequently filed and the parties to the Draper Litigation gave notice of their intent to continue their previously asserted claims. The Chapter 9

petition was not filed until a second mediation was held on October 6, 2008, and failed. See, e.g. In re Town of Westlake, Tex., 211 B.R. 860, 868 (Bankr. N.D. Tex. 1997) (fact that the town faced prospect of "frozen funds, multiple litigation, and disannexation of a substantial portion of its tax base" demonstrated that the petition was filed in good faith).

The Eagles Watch Creditors' primary argument is that the Debtor's lack of good faith in filing the Petition is evidenced by its failure to investigate and pursue allegedly viable claims against Pierce County and its insurers. Although the Court agrees that the failure to pursue assets may be evidence of bad faith in certain instances, the Court does not find that the Debtor's failure to tender claims in this case is evidence of bad faith in filing the Petition.

As stated in the prior section, the Debtor denies liability for mold-related damages and further denies that Pierce County or its insurers have liability for its obligations even if mold-related claims have been established. Thus, the Court is unconvinced that it is bad faith for the Debtor to refuse to tender claims that it does not believe are valid to a third-party for whom it believes has no liability pursuant to State law. Despite denying liability, the Debtor has exhibited a desire to deal with these claims and readjust its debts. The Debtor has proposed a Plan, which has been substantially amended in order to obtain the approval of two of the three objecting parties, the UCC and US Bank. Although liability for mold-related claims is still denied as well as coverage by Pierce County, the Debtor's Amended Plan contains a mechanism for dealing with such claims and evaluation for submission to Pierce County. The Court finds that a preponderance of the evidence indicates that the Petition was filed in good faith.

**B. Confirmation**

A Chapter 9 debtor is required to file a plan with the petition, or by such date the court fixes. See § 941. Unlike Chapter 11, there is no provision in Chapter 9 allowing creditors or other parties in interest to file a plan. This limitation is required by the United State Supreme Court's decision in Ashton v. Cameron County Water Improvement Dist. No. 1, 298 U.S. 513, 56 S. Ct. 892 (1936), interpreting the Tenth Amendment to the Constitution as requiring that a municipality be left in control

AMENDED MEMORANDUM DECISION - 15

of its governmental affairs during a Chapter 9 case. Neither creditors nor the court may control expenditures for municipal services or otherwise control the affairs of a municipality indirectly through the mechanism of proposing a plan of adjustment of the municipality's debts that would in effect determine the municipality's future tax and spending decisions. See § 904.

Section 943 sets forth seven requirements for confirmation of a plan. If these standards are met, the bankruptcy court must confirm the plan. See Collier ¶ 943.01, at 943-4. Section 943(b)(1) also requires that the plan comply with certain other provisions of Title 11 made applicable by § 103(e) and § 901. Section 901, makes applicable many of the plan confirmation requirements contained in Chapter 11, including § 1129(a)(2), (a)(3), (a)(6), (a)(8) and (a)(10). The debtor bears the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence. In re Mount Carbon Metro. Dist., 242 B.R. 18, 31 (Bankr. D. Colo. 1999).

Objections to the Debtor's original Plan were filed by the Eagles Watch Creditors, the UCC and US Bank. After extensive negotiations, the Debtor resolved its objections with the UCC and US Bank, resulting in the filing of the Amended Plan. The only remaining objection to the Debtor's Amended Plan has been asserted by the Eagles Watch Creditors.

There is no dispute that the Debtor's Amended Plan satisfies the confirmation requirements of § 943(b)(3), (5) or (6). At issue is whether the Amended Plan satisfies the requirements of § 943(b)(1), (2), (4) and (7). The Court will examine each objection separately to determine if the Amended Plan is confirmable.

1. Article II.A.18

The Eagles Watch Creditors argue that the Amended Plan fails to satisfy the requirement of § 1125(b), made applicable by § 901, because the definition of "Debtor" does not contain adequate information. The term "Debtor" is statutorily defined in § 101(13) as a "person or municipality concerning which a case under this title has been commenced." The Amended Plan defines "Debtor" as the "Pierce County Housing Authority, whether prior to or following confirmation." Article II.A.18.

This is a proper designation of the debtor filing the Petition in this case and the Court will not require an expanded definition.

2. Article II.A.27

The Eagles Watch Creditors argue that the term "Insurance Claims" also fails to contain adequate information. It is further alleged that this definition is inequitable, not feasible and not in the best interest of creditors. It is contended that the definition is too narrow in that it fails to include potential claims against the Debtor's former counsel. Based on the testimony presented, it is evident that this omission was intentional. The Debtor denies any liability by its former counsel and has made the conscious decision to exclude it as a potential claim that could be investigated and pursued by the Post-Confirmation Committee (defined in Article II.A.40 as the "Official Unsecured Creditors Committee following Confirmation"). Article VII.H. specifically provides that "[a]part from Insurance Claims, all rights, claims and causes of action, whether equitable or legal, of the Debtor against all persons are reserved for the Post-Confirmation Debtor." This objection is not an issue of adequate information. The real issue is whether the Debtor's failure to allow the Post-Confirmation Committee to pursue potential claims violates the best interest of creditors set forth in § 943(b)(7). As this issue is raised in regards to several provisions in the Amended Plan, the Court will discuss this issue collectively below.

3. Article IV.B.5.b.(1)

The Eagles Watch Creditors object to the provisions for payment of the claims of Class 5 claimants who select Alternative A, because as amended, such claimants will not be paid until all potential insurance claims have been exhausted. In its supplemental reply, the Debtor has admitted that the language of this section should be revised to clarify that claimants who select Alternative A will be paid within five business days of the earlier of the date that (i) the funds in the Distribution Account are sufficient to pay in full all Claimants electing treatment under Alternative A, or (ii) all recoverable assets have been liquidated. With this revision, the Court concludes that this section does not prohibit confirmation.

AMENDED MEMORANDUM DECISION - 17

4. <u>Article V.A</u>

This provision allows the Post-Confirmation Debtor to settle or compromise any controversies regarding claims without notice or further order of the Court.  According to the Eagles Watch Creditor's Supplemental Objection to First Amended Plan, this provision violates § 943(b)(3), (b)(7) and § 1125(b).  The Court is unclear how such provision violates § 943(b)(3), which requires that any amounts to be paid by the debtor or any person for services or expenses in the case or incident to the plan to have been fully disclosed and reasonable.  Nor is § 1125(b) applicable, which forbids solicitation of a plan unless parties have first had an opportunity to review the plan or a summary of the plan, and a disclosure statement.

The Eagles Watch Creditors state that the language should be revised to state that the Post-Confirmation Debtor cannot settle or compromise a claim in a manner that conflicts with the terms of the Plan without notice to creditors.  Such a requirement, however, is self evident and provided for in the agreement itself.  The Post-Confirmation Debtor is required to comply with the terms of the confirmed Plan.  It is an event of default to fail to comply with a material provision of the Plan under Article VIII.I, which if not cured after notice, entitles the party to seek additional remedies.  The Debtor is also bound by the terms of a confirmed plan pursuant to § 944.

5. <u>Article VI.C</u>

This provision allows the Debtor to reject all unexpired leases and tenancies of those claimants set forth on Exhibit A to the Amended Plan.  Such claimant is a month-to-month tenant and the rejection would be effective 60 days following the Effective Date of the Plan.  The claimant shall also be paid a moving allowance of $1,500.

The Eagles Watch Creditors argue that this provision violates the best interest of creditors under § 943(b)(7), fails to provide for the same treatment of each claim or interest in a class under § 1123(a)(4), and allows the debtor to take action prohibited by the law under § 943(b)(4).

AMENDED MEMORANDUM DECISION - 18

This provision has been substantially revised since the original Plan was filed. The original Plan only applied to those claimants in Class 6 who chose Alternative A. The provision in the Amended Plan applies to all claimants listed on Exhibit A. According to Exhibit A, this provision would affect tenants in only four or five units. The original Plan required the claimant to terminate the tenancy within 20 days of the Effective Date and covenant not to seek tenancy in any other of the Debtor's properties. In exchange, they would receive a cash-payment only if the adjacent lot sells or an insurance recovery is obtained. Under the Amended Plan, the claimants whose tenancies are terminated are guaranteed a payment of $1,500 within two business days after the tenancy is transferred to the Debtor. Since the hearing, the Debtor has since filed a Statement of Intention to Amend First Amended Plan for Adjustment of Debts of Pierce County Housing Authority (Statement of Intention), proposing to amend this section further to provide that each claimant shall "have the option of moving to another of the Debtor's affordable housing facilities (any facility other than the Eagle's Watch facility), so long as such Claimant can satisfy ordinary and customary screening requirements." Statement of Intention at 2 (No. 209).

The Eagles Watch Creditors argue that the Debtor should be required to relocate them to another non-hazardous apartment of Eagles Watch. Although some of the displaced tenants may prefer this option, the failure of the Debtor to adopt this approach is not a basis for denying confirmation. The terms contained in the Amended Plan were agreed upon after negotiations with the UCC and provide more favorable treatment to those claimants whose tenancies are terminated than originally proposed. The Debtor has agreed to further revisions as set forth in the Statement of Intention providing the tenant with the option of relocating to another of the Debtor's affordable housing facilities. The Court is not aware of any prohibition against the Debtor terminating these month-to-month tenancies under either the Bankruptcy Code or state law. See RCW 59.18.200(1)(A) (authorizing month-to-month tenancies to be terminated upon 20 days' notice for any reason). The Debtor should not be required to transfer the tenants to another unit at Eagles Watch, especially as the tenants at issue have asserted mold-related injury as a result of residing at this facility.

AMENDED MEMORANDUM DECISION - 19

The Court also finds the offer to pay $1,500 in relocation costs to be reasonable. Although the Court agrees that it may impose a hardship on the tenant to receive the funds two days after vacating the premises, the Court is unaware of any requirement that would impose a duty on the Debtor to tender such funds before possession has been transferred. The Court concludes that this provision, as set forth in the Statement of Intention, is confirmable.

6. Article VII.A

This section is simply a summary of the means for executing the Debtor's Amended Plan. Specific means for execution are set forth in more detail in the remaining provisions. Nothing contained in this general summary violates a plan confirmation requirement.

7. Article VII.D

The Eagles Watch Creditors object to the limitations set forth in the Amended Plan regarding who the Post-Confirmation Committee can employ as professionals. This section provides that the Post-Confirmation Committee can only employ those "professionals that (i) do not hold or represent an interest adverse to the Debtor, and (ii) are disinterested persons, within the meaning for those terms as set forth in 11 U.S.C. § 327(a)." Article VII.D. The Eagles Watch Creditors argue that this provision violates § 943(b)(7), § 1123(a)(5) and § 1125. As with prior objections, the Court does not find that § 1123(a)(5) or § 1125 are applicable. The primary issue is whether the Debtor's proposed restrictions on the Post-Confirmation Committee's retention of professionals violates § 943(b)(7). This objection will also be addressed in more detail below.

8. Article VII.F

This section provides for the assignment of insurance claims to the Post-Confirmation Committee. The Eagles Watch Creditors assert that this section should be revised (1) to reflect that the Debtor is transferring, not assigning such claims, (2) the $15,000 proposed for the examiner is available for the pursuit of the insurance claims, and (3) that all proceeds recovered as a result of the

insurance claims will be deposited into the Distribution Account, regardless of whether the proceeds are derived from an insurance policy or an action maintained as a result of an insurance policy.

The Debtor has made clear its intent to transfer the insurance claims to the Post-Confirmation Committee and that it is willing to work with the Committee to ensure that the language is sufficient and will not defeat insurance coverage. The issue of the examiner and attendant fees will be discussed in more detail below.

9. Article VII.G

This provision proposes the appointment of an examiner to investigate and report to the Court the existence of possible insurance coverage by Pierce County or its excess insurers. The Eagles Watch Creditors argue that this provision should be removed in its entirety because it is in the best interest of creditors to immediately pursue whatever insurance claims may exist.

The "best interest of creditors" requirement of § 943(b)(7) is "generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have." Mount Carbon, 242 B.R. at 34. The "best interest" test has been described as a "floor requiring a reasonable effort at payment of creditors by the municipal debtor" and the "feasibility" requirement as a "corresponding ceiling which prevents the Chapter 9 debtor from promising more than it can deliver." Mount Carbon, 242 B.R. at 34.

The Debtor strenuously denies liability by Pierce County for any of its obligations, and its stated justification for the appointment of an examiner is to prevent further needless litigation. The Court has no opinion whether coverage by Pierce County is available. The testimony, however, of the former Director of Risk Management for Pierce County, as to the possible existence of coverage under Pierce County's self-insurance program and excess insurance policies, is found to be credible. The Debtor did not present any testimony refuting the former director's opinion. The Court agrees that it is not in the best interest of creditors to go through the added step and cost of requiring an examiner to review and approve for tender every claim solely due to the Debtor's expressed intent of limiting litigation. There is no evidence that the Post-Confirmation Committee is not able to conduct this review without

the assistance of an examiner.  If the Post-Confirmation Committee, with the assistance of counsel, determines that the claims should be tendered, it can likely do so with minimal cost.  It will then be up to Pierce County and any potential insurers to decide whether or not to defend against such claims.

The same is true of the alleged claim against the Debtor's former counsel.  The Debtor states that it does not believe that its former counsel has any liability and that it is not a requirement of confirmation that it allow the Post-Confirmation Committee to pursue any and all potential claims.  In support, the Debtor cites to In re Corcoran Hosp. Dist., 233 B.R. 449 (Bankr. E.D. Cal. 1999), where the bankruptcy court determined that a hospital district had no obligation to raise taxes to pay unsecured claims in full in order to demonstrate that the plan was proposed in good faith and fair and equitable.  Corcoran, 233 B.R. at 459-60 (concluding that a plan was proposed in good faith where the debtor hospital demonstrated that it could not raise taxes sufficient to pay more to creditors).

Unlike in Corcoran, the Debtor has no taxing authority, and it is undisputed that Washington State law prevents the Debtor from raising rents as a possible source of funds to pay creditors.  See RCW 35.82.080.  Further, in Corcoran the court specifically found that the evidence indicated it would be a "futile exercise" to raise taxes.  Corcoran, 233 B.R. at 459.  Lastly, the court recognized that contrary authority does exist where the court could require the Debtor to raise taxes if the evidence indicated that it was inequitable and unfair for the Debtor not to raise taxes.  Corcoran, 233 B.R. at 460 (citing Fano v. Newport Heights Irr. Dist., 114 F.2d 563, 566 (9th Cir. 1940)).  Similar to Fano, the issue in this case is whether it is in the best interest of creditors and in good faith to confirm a plan that precludes the Post-Confirmation Committee from investigating and possibly pursuing all potential sources of recovery already in existence.

The Debtor has failed to state a valid reason why the Post-Confirmation Committee should be prevented from evaluating this claim.  The Court concludes that a preponderance of the evidence indicates that it is not in the best interest of creditors to allow the Debtor to remove this determination from the Post-Confirmation Committee.  After evaluating the claim, the Committee may decide that there is no potential liability or that the cost of pursuing such claim outweighs any potential benefit.

AMENDED MEMORANDUM DECISION - 22

This decision, however, is a valuable right that the Debtor should not eliminate under the terms of its Amended Plan. To do so is an attempt to cut-off potential sources of funds for payment of claims and also raises the issue of whether the Debtor's Amended Plan has been proposed in good faith.

Under § 1129(a)(3), made applicable to Chapter 9 by § 901(a), it is a requirement of confirmation that the plan be proposed in good faith.[6] Although the term "good faith" is not defined in the bankruptcy code, nor is there significant case law exploring its meaning in the context of a Chapter 9 plan, courts have looked to cases interpreting its meaning under Chapter 11 and Chapter 13 for guidance, as these chapters also require that plans be proposed in "good faith." See § 1129(a)(3); § 1325(a)(3).

Most courts agree that the determination of whether a plan has been proposed in good faith "requires a factual inquiry of the totality of the circumstances." Mount Carbon, 242 B.R. at 39. Factors a court should examine include: "(1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair." Mount Carbon, 242 B.R. at 40-41.

The Court concludes that the Debtor's attempts to forestall the ability of the Post-Confirmation Committee to investigate potential sources of recovery does not indicate a sincere attempt by the Debtor to readjust its debts by maximizing the creditors' recovery.

The same is also true of the Debtor's restrictions on the employment of professionals by the Post-Confirmation Committee contained in Article VII.D. As stated above, this section provides that the Post-Confirmation Committee can only employ those "professionals that (i) do not hold or represent an interest adverse to the Debtor, and (ii) are disinterested persons, within the meaning for those terms as set forth in 11 U.S.C. § 327(a)." Article VII.D. Counsel for both the Debtor and the

---

[6] It is important to note that this is a different inquiry than whether the petition was filed in good faith. See In re Madison Hotel Assoc., 749 F.2d 410, 425 (7th Cir. 1984).

AMENDED MEMORANDUM DECISION - 23

UCC admitted at the hearing that this provision was inserted by the Debtor and not required by the Bankruptcy Code. The Court agrees. Section 327 is not applicable to the retention of a professional for the Post-Confirmation Committee. Rather, the employment of professionals by the Post-Confirmation Committee is governed by § 1103, made applicable to Chapter 9 by § 901. The relevant distinction in this case is that § 1103, unlike § 327(a), does not contain a requirement that professionals employed by a committee be "disinterested." Section 1103(b); In re Big Rivers Elec. Corp., 355 F.3d 415, 439 (6th Cir. 2004). Unlike § 327, this section also states that although such professional may not represent any other entity having an adverse interest in connection with the case while employed by the committee, "[r]epresentation of one of more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest." Section § 1103(b).

The Debtor admits that the intent of this section is to prevent Cochran's continued involvement in this case. Whatever the intent, the Court concludes that this is another improper restriction by the Debtor on the rights of the Post-Confirmation Committee. In requiring that any person selected by the Committee be "disinterested" within the meaning of § 327(a), this is a clear attempt by the Debtor to restrict the Post-Confirmation Committee's ability to select counsel they may believe to be in their best interest. The Court is making no representation as to whether it would be in the best interest of the Post-Confirmation Committee to select Cochran to assume this role. The Post-Confirmation Committee may determine that because of the animosity between the Debtor and Cochran that the retention of another individual would be more suitable. In this case, no evidence was presented as to why this restriction, as well as other restrictions, on post-petition litigation is necessary. As stated above, good faith requires an evaluation of the totality of the circumstances. A court looks to whether a plan is proposed with honesty and sincerity and whether a plan's terms are fundamentally fair. Mount Carbon, 242 B.R. at 40-41. Similar to the Debtor's attempt to restrict the pursuit of all legitimate causes of action that may increase the recovery of creditors, the Debtor's proposal to restrict who the

Post-Confirmation Committee may employ, through the use of a Bankruptcy Code section that is otherwise inapplicable, does not exhibit sincerity or fairness in dealing with its unsecured creditors.

The Court is aware that a Chapter 9 bankruptcy is somewhat unique and that its role is limited both by the Code, in particular § 903 and § 904, and by the Tenth Amendment to the U.S. Constitution. One responsibility the Court does have, however, is to ensure that the Amended Plan meets the requirements of confirmation. It is a requirement that a plan treat all creditors fairly with the focus on a totality of the circumstances. <u>Mount Carbon Metro Dist.</u>. 242 B.R. 18, 39-40. The Debtor has presented little evidence to support the restrictions on post-petition litigation or the UCC's potential counsel. The Court concludes that the Amended Plan as proposed is not confirmable with (1) the requirement that an examiner be appointed to determine whether to pursue claims against Pierce County or its insurers, (2) the limitation on the ability of the Post-Confirmation Committee to evaluate and possibly pursue all legitimate claims that may result in increased distribution to the unsecured creditors, and (3) the limitation on the ability of the Post-Confirmation Committee to retain a professional that it determines would best represent their interests. As proposed, the Amended Plan is not in the best interest of creditors as required by § 943(b)(7) and does not meet the good faith requirement of § 1129(a)(3).

10. <u>Article VIII.F</u>[7]

The Eagles Watch Creditors object to this provision regarding the Debtor's document retention policies. The Debtor indicated at the hearing that they are willing to revise this language to deal with this objection.

---

[7] The Eagles Watch Creditor's supplemental pleading incorrectly refers to this section as Article III.F.

AMENDED MEMORANDUM DECISION - 25

11. Plan May Defeat Insurance Coverage

The Eagles Watch Creditors have raised the general concern that the language of the Amended Plan may defeat insurance coverage. The Debtor has again indicated its intent to work with the parties to ensure that this is not an issue.

In summary, the Court approves the Debtor's Disclosure Statement and concludes that the Debtor is eligible to be a debtor under Chapter 9. Confirmation of the Amended Plan as proposed is denied without prejudice.

DATED:   August 24, 2009

_____
Paul B. Snyder
U.S. Bankruptcy Judge